Bartley, C. J.
The first assignment of error is, that the plaintiff in error was not furnished with a copy of the indictment before being put upon his trial.
The plaintiff in error had a constitutional right. “ to demand the nature and cause of the accusation against him, and to have a copy thereof.” It does not, however, appear from the record that the plaintiff in error exercised this right, or that, on demand, a copy of the accusation was refused him. This assignment of error appears to be founded on the provision of the 10th section of the “ act directing the mode of trial in criminal cases,” Ohio Rev. Statutes 724, which is in the following words: “A copy of the indictment, and a copy of the panel of the jury returned by the sheriff, shall be delivered to every person who may be indicted for an offense, the punishment whereof is capital, at least twelve hours before the trial.” This provision of the statute is directory as to a duty to be performed on the part of the state, preliminary to the trial. The performance of this duty, however, is not required to be made a matter of record, and, therefore, the mere omission of such fact, in the record of the judgment and pro *103 ceedings, eannot be error. In tbe absence of any proof to tbe contrary, it will be presumed that wbat tbe law required of tbe officers acting for the state, was done. If a defendant in a criminal prosecution wishes to avail himself of such omission of duty on the part of the state, he must do it on motion before trial, or interpose it as an objection to being put on his trial, and show the omission on the record by bill of exceptions. This was not done in this case. The mere averment of the fact by the accused, in his motion for a new trial, or in his assignment of errors, cannot make the objection available, on writ of error. And it being of such a nature as to be a subject of waiver, if the party accused proceed to trial without making the objection, it is a waiver of the omission, and he cannot, after trial, interpose the objection to affect the validity of the proceedings on the trial. True it is, that it has been said in broad and unqualified language, that in a criminal cause a defendant can waive nothing. But the inaccuracy of this assertion is shown in every day’s practice in our criminal courts. There are some things, it is very true, in criminal cases which cannot be waived. None of the proceedings essential to the jurisdiction, and the foundation of the judgment of the court, can be waived. But there are other matters in the proceedings in a criminal prosecution which a defendant may waive; and among these is the copy of the indictment, and a copy of the panel of the jury returned by the sheriff.
The second assignment is, that a list of the grand jurors, who returned the indictment, was not furnished to the accused before trial; and that the paper furnished him, purporting to be a copy of the indictment, did not contain the names of the grand jurors.
There is no law requiring a list of the names of the grand jurors to be furnished to the accused, before being put on his trial. There is no rule of the common law requiring it, and it is not provided for by statute. As the legal disqualification of the grand jury, or any member of *104 it, may be made tbe ground of a special plea in tbe defense (see Doyle v. The State of Ohio, 17 Ohio Rep. 223), there may have been some reason for a legislative provision on tbe subject. Hut tbe courts have no power to make laws. In tbe case of Mahan Pettyjohn et al. v. The State, 10 Ohio Rep. 233, it was said, that tbe statutory provision requiring a copy of tbe indictment to be given to tbe accused, was not complied with unless tbe caption of the indictment contained a list of tbe names of tbe grand jury, and this was announced upon tbe authority of a circuit decision. But it was merely obiter, and in no wise pertinent to the case before tbe court, which involved tbe single question, whether*, on a trial of three defendants at tbe same time, on a joint indictment, tbe state could exei’cise two peremptory challenges to jurors for each defendant. And in tbe same case it was held by tbe coux-t, that it was not essential to tbe sufficiency of an indictment that it contaixx tbe names of the grand jury. Although it appears that a different rule once prevailed, yet it has been well settled for many years, that it is not requisite that an indictment should set forth tbe names of tbe grand jurors. It is essential, however, that tbe record of tbe case should show tbe names of tbe gx-axxd jury by whom tbe indictmexxt was found; and tbe x’ecox’d of tbe ease befox-e us is not deficiexxt in that respect.
Tbe third assignment is, that tbe court erred in allowing tbe state to challenge tbe juror David L. Jenkins for cause. Tbe cause for tbe challenge of this juror is not made to appear, except so far as it is set forth in tbe mere statemexxt of tbe accused, in tbe grounds for bis motion, for a new trial. And it does not appear in tbe record, that any objection was made, on behalf of tbe accused, to tbe challenge of this juror until after vex*dict.
Tbe foux’tb assignment is, that tbe court erred in permitting tbe counsel for tbe state to challenge a juror peremptorily. I am well aware that it was held, by tbe late supreme court on tbe circuit, that the right of peremptory *105 challenge, in inapanneling a jury for the trial of a person for an offense, the punishment whereof is death, could not be exercised on the part of the state. But this ruling was never satisfactory, and it does not appear to be warranted by any fair interpretation of the statute. By the 15th section of the statute relating to juries, passed Eeb. 9th, 1831, and which took effect June 1st, 1831, it was provided, “That every prosecuting attorney, and every defendant, upon the trial of an indictment, may challenge, peremptorily, two of the panel,” etc. By the statute passed at the same session, on the 7th March, 1831, directing the mode of trial in criminal cases, and which took effect on the same day with the other act, it was provided (section 7th), that in case of a prosecution for an offense, the punishment whereof is capital, thirty-six jurors should be summoned; and by the 9th section of the same act, the defendant, in such a case, is authorized to challenge twenty-three of the jurors peremptorily; and by the 11th section, it is further provided, in general terms, that “ each prosecuting attorney and defendant shall have the liberty of challenging jurors for cause, the validity of which the court shall try.” These statutory provisions must be construed in their connection with the same subject-matter. They were required, by express provision, to take effect each on the same day. The act directing the mode of trial in criminal cases, cannot have the effect to repeal or alter the act relating to juries, if, by any rational construction, all the provisions of the two acts can stand together. By the statute first passed, the right to challenge two of the panel peremptorily is expressly conferred on the prosecuting attorney, as well as on the defendant, upon the trial of an indictment. By the other act, the defendant, in a case of capital punishment, is allowed to challenge twenty-three jurors peremptorily. This of course supersedes the provision of the other act, as to the peremptory challenge of the defendant, so far as it would otherwise have been applicable to a case of a person on trial for an offense, the punishment whereof *106 is death. But there is nothing in the act last passed expressly altering or modifying the right of peremptory challenge by the prosecuting attorney, applicable to all cases, conferred by the act first passed. And not only for the well recognized reason, that repeals by implication are not favored, but in view of the still more unbending rule of construction, that an unreasonable and absurd operation of a statute is to be avoided, when it can be by any rational interpretation of the language employed, the statute enlarging the right of the defendant to a peremptory challenge, in capital cases, from two to twenty-three of the panel, should not be so construed as to deprive the prosecuting attorney, by' mere implication, of the right expressly, and in general terms, conferred to two peremptory challenges. The mere fact that the statute last enacted is silent as to the right of peremptory challenge, conferred on the prosecuting attorney by the former statute, amounts to nothing at all. It was not necessary that the statute, which enlarged this right of the defendant in capital cases, should reenact or affirm the right already expressly conferred on the prosecuting attorney, on the trial of all indictments. And the provision expressly affirming the right of each party, in criminal cases, to challenge for cause, can have no effect whatever upon the question under consideration. It has been argued, that the fact that the exercise of twenty-three peremptory challenges by the defendant, and two by the prosecuting attorney, would leave only eleven of the thirty-six jurors summoned, being insufficient for a full jury. There would be much force in this, if the statute made it requisite or essential that the jury should be obtained from the thirty-six summoned. But this is not the case. If the panel summoned be exhausted by challenges, either peremptory or for cause, the statute requires bystanders to be called, to any extent necessary, to make up the jury. So that the right of peremptory challenge conferred on the state by express provision, and in terms applicable to all indictments, can *107 not be controlled or curtailed, in a case of capital punishment, by the consideration, that in case the defendant should exercise his twenty-three challenges, and the prosecuting attorney two challenges, that the whole jury could not he obtained, from the thirty-six summoned. The right of the prosecuting attorney, therefore, to two peremptory challenges, on the trial of every person indicted for a criminal offense, conferred by the statute relating to juries, was not repealed in part, or modified by implication. So that there was no error in the ruling of the court below in this respect.
The fifth assignment is, that the court erred in admitting in evidence the confessions of Philip Eouts. It appears, that the statements of Philip admitted were made in the presence of the defendant Jonas, who participated in the narration, and assented to the truth of what Philip said. It is insisted, however, that the confessions were procured by inducements held out which rendered them incompetent as evidence. The confession relied on by the state consisted in the assent of the plaintiff’in error to the statements of Philip Eouts, made in his presence and hearing. It appears that, prior to the alleged confession, the witness John Baine, who had the custody of Philip Eouts, said to Philip, that his brother Jonas had confessed the crime and charged you with it; and further told him, u if he was guilty, it could not put him in any worse condition, and he had better tell the truth cd all times.”
The rule which excludes confessions as incompetent, upon the ground of the undue influence of inducements held out, does not appear, at all times, to have been well defined in its application. A free and voluntary confession is one of the most satisfactory proofs of guilt; for an innocent person will not voluntarily subject himself to infamy, and liability to punishment, by false statements against himself. But to entitle a confession to such consideration, it must be voluntary, and made understandingly. If extorted or induced by the influence of either threats, *108 or promises of advantage, confessions are incompetent as evidence. And as the law cannot measure the effect of such means upon the mind of a prisoner, confessions are excluded, if it appear that any degree of influence has been exerted over the mind of the prisoner to procure them. Although if has been held that it is not an objection to the competency of such evidence, that the confession was made under a mistaken supposition, that an accomplice had confessed, or was in custody, and even though an artifice had been used to induce 'such supposition ; yet such evidence is always received with caution and distrust. Such admissions are generally made when the prisoner is under arrest, and often when his mind is agitated and overwhelmed with distress, and under a sense of degradation and desertion by the world, when every ray of hope is eagerly caught at, and when the delusive idea of personal safety might easily beguile him into expressions or disclosures in compliance with the wishes or solicitations of those around him, and especially those charged with his custody. And added to all this, is the difficulty, if not impossibility, of obtaining from a witness an exact repi’esentation of the tone of voice, emphasis, expx’ession of countenance, manner and action expressive of the true state of the mind and meaxiing of the prisoner in making the statement. The weight of such testimony, when admitted, often depends much on circumstantial corroboration. But the test of its incompetency appears to be the existence of reasonable ground for presuming, under the circumstances, that the disclosure was made under the influence of some promise or threat of a temporal nature.
In the case before us, what ground is there to presume that the confession of the plaintiff in error was made under an improper inducement ? The advice was, that he had better tell the truth at all times; and that, if he was guilty, the truth could place him in no wox'se condition. No inducement, by way of a promised benefit, was, by this *109 expression, held ont. Besides, what was said to Philip separately, conld not, had it been communicated to Jonas, have operated as an inducement for his consenting to the correctness of the statements of Philip, in making the confession.
The sixth assignment presents no question. The incompetency of Philip Eouts’s statements made to Parsons, offered on the part of the defense, was not even questionable.
The seventh and eighth assignments are predicated on the charge of the court to the jury, and the refusal of the court to charge the jury in certain particulars; but as. there is no bill of exceptions in the case, showing either what the court did charge, or what the court refused to charge, no question touching the charge of the court to the jury can be made in the case. And no question can he raised by the ninth assignment, founded on the overruling of the motion for a new trial, inasmuch as the record does not disclose all the evidence on the trial, and presents no legal ground for a new trial.
There is, finally, a general assignment of other errors manifest and apparent on the record.
Under this general assignment, the question of the sufficiency of the indictment is presented. If that does not contain all the material averments essential to a charge of murder in the first degree, under the statute of this state, the judgment is erroneous. The averments of the indictment, descriptive of the overt act, alleged as the crime, do not charge the plaintiff in error with a purpose or intent to hill. Is that essential to .a charge of murder in the first degree, in Ohio?
It is conceded, that a purpose or design to kill is not an essential ingredient in murder at common law. The crime at common law consists in the unlawful killing of a human being, under the king’s peace, with malice prepense or aforethought, either express or implied by law. 1 Russ, on Cri. 482. This is the substance of the definition, or *110 rather description, of murder given by Lord Coke, (3 Inst. 47, 50,) and sanctioned by Blackstone, (4 Bla. Com. 198,) and all the modern English authorities. The distinguishing feature in this definition is that of malice prepense or aforethought. By this malice, it is said, is meant, not simply a special malevolence to the individual slain, but a wicked, depraved and malignant spirit, a heart regardless of social duty, and deliberately bent on mischief. It is held, that there is express malice where one person kills another with a sedate, deliberate mind, and formed design, to take life; and that, where a person, not intending to take life, but designing to inflict a grievous bodily harm, or while perpetrating some other and collateral felony or misdemeanor, kills another, there malice is implied by law from the deliberate cruel act, or the depravity and criminal inclination of the perpetrator at the time. But, in England, murder is not classified into degrees, but every murder is of the same grade, and subject to the same penalty, whether the malice be express or implied,. So that, intention or formed purpose to kill, is not essential to constitute murder at common law. An averment, therefore, of a purpose or intent to kill, is not requisite in an indictment for murder at common law.
But the common law in relation to murder, as well as other matters, is subject to modification and alteration by statute. In some of the states of this country, the law on the subject of murder differs materially from the common law of England. It is true, the statute enacted by Congress prescribes the punishment for murder without defining it, leaving the term murder, as used in the act, to be understood as defined at common law. Act 30, April, 1790, sec. 8. United States v. Magill, 1 Wash. C. C. Rep. 463. And in Massachusetts, it is simply provided by statute, that, “ every person, who shall commit the crime of murder, shall suffer the punishment of death for the same,” without describing what shall constitute murder. Under these statutes, of course, the form of the indictment for *111 murder at common law would be proper, and altogether sufficient. In Pennsylvania, Virginia-, New York, and other states, different degrees have been created in murder, affixing the punishment of death to murder with express malice, and other murder of the most aggravated character, and imprisonment as the punishment for the other and less aggravated kinds of murder. The statutes of these states, however, in making the different degrees in murder, have followed, as closely as practicable, the common law description of murder. So that, in many instances, the form of the indictment for murder at common law would seem to be sufficient in those states. In .other states, however, murder is defined by statute essentially different from murder at common law in various and material matters. In Ohio, there are no crimes or misdemeanors by the common law, and the statute of this state, which defines murder with great precision and certainty, is recited by Wharton, in his Treatise on American Criminal Law, (page 510, third edition,) as an illustration of the essential difference between statutory murder and murder at common law. -This statutory provision is as follows :
“ That if any person shall purposely, and of deliberate and premeditated malice, or in the perpetration or attempt to perpetrate any rape, arson, robbery or burglary, or by administering poison, or causing the same to be done, kill another, every such person shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall suffer death.”
“ That if any person shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree, and, on conviction thereof, shall be imprisoned in the penitentiary, and kept at hard labor during life.”
The Supreme Court of the state gave a construction to this statute, in a circuit decision, reported in Wright’s Rep. 27, made as early as 1881, in the following language:
“ Murder in the first degree is the intentional, unlawful killing, by one reasonable being of another, in the peace of the state, of deliberate and premeditated malice. Murder in the second degree, is the intentional, malicious and unlawful killing, by one reasonable being of another, in the peace of the state, without deliberate or premeditated malice. Manslaughter, under our statute, is the unlawful killing, *112 by one reasonable being of another, in the peace of the state, without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act.”
“Malice and a design to MU, are essential ingredients in the crime of murder, in either degree, while the first ingredient is altogether excluded from the crime of manslaughter. The intention or design to kill, is also excluded from the crime of manslaughter, where the death result from an unlawful act, designed, to effect another object; but if there arise a sudden quarrel, and one under great provocation, instantly Mil another, intentionally, it would be manslaughter.”
And in the same ease, Judge Wright, in his instructions to the jury, said:
“To convict of murder in the first degree, you must, in addition to the points I have mentioned, be satisfied: 1. That the prisoner perpetrated the act purposely ; 2. That he did it with intent to Mil; 3. That he did it of deliberate and premeditated malice.”.....“If these things are all proven, and you find the defendant guilty of murder in the first degree, you need examine no farther. If not proven to your satisfaction, you will then examine further.
“ To convict of murder in the second degree, you must be satisfied : 1. That the prisoner perpetrated the act purposely and suiioiously ; 2. With intent to MU; and 3. Without deliberation or premeditation.”
This interpretation of the statute relating to criminal homicide, has been substantially affirmed, in numerous subsequent decisions on the circuit; (The State v. Gardner, Wright’s Rep. 392; and The State v. Thompson, Ibid. 617;) has been recognized by the supreme court in bank, in sundry cases, (Shoemaker v. The State, 12 Ohio Rep. 43; Clark v. The State, Ibid. 483,) and has been consistently followed as the settled law of Ohio for the last twenty-five years.
It may, therefore, be assumed as well settled, that murder, in Ohio, is different from murder by the common law of England, not simply in the fact of the two degrees into which it is divided, but especially and most essentially, in the fact that a purpose or intent to kill is made by the statute an essential and distinguishing feature in murder, both of the first and also of the second degree. It follows that an indictment for murder, under the statute of this State, must contain a direct averment of a purpose or intent to kill, in the description of the crime charged.
*113 Every crime or offense consists of certain facts and circumstances comprised in the overt act of the perpetrator. In case of an offense at common law in England, the facts and circumstances constituting the offense are defined by the rule of the common law relating to that subject. And in case of an offense against a statute, the facts and circumstances constituting the crime are defined by the statute creating the offense. It is laid down by Archbold, in his work on Criminal Pleading, (1 vol. 85, Watterman’s ed.) as a general rule of criminal jurisprudence, with respect to the averments of an indictment descriptive of the offense, “ that all the material facts and circumstances comprised in the definition of the offense, whether by a rule of the common law, or by statute, must be stated; if any one material fact or circumstance be omitted, the indictment will be bad.” Another standard author lays it down as a general rule, in regard to indictments, that the special manner of the whole fact ought to be set forth with such certainty, and so specifically, that it may judicially appear to the court what judgment is to be pronounced in case of a conviction, that the accused may clearly and distinctly know the charge he is called upon to answer, that the record may with certainty furnish a bar to the defendant against a second prosecution for the same offense, and that posterity may know what law is to he derived from the record. 1 Chit. Or. Law 227. 2 Hale 183, 84. It is an invariable rule, that an indictment must charge the crime with certainty and precision, and must contain a complete description of such facts and circumstances as will constitute the crime; and if any one fact or circumstance, which is' a material ingredient in the offence, as defined by the statute, be omitted, the indictment will be bad. And a statement of any one of these facts or circumstances as a legal result, or by way of inference or conclusion from antecedent averments, is bad, and fatal to the indictment. 1 Chitty’s Or. Law 228; 1 Archb. Cr. PL (Wat.) 87. The last author cited, on the *114 same page, adds: “The intent with, which an act is done is often made a material ingredient in the offense, as defined by the common law, or by statute; and when it is so, care must be taken to state in the indictment, that the offense was committed with that intent, otherwise the indictment will be bad.” Rex v. Phillips, 6 East. Rep. 454; 2 Hale 84. These rules of procedure, in the administration of criminal justice, have been repeatedly recognized and adopted by the Supreme Court of this state. Lamberton v. The State, 11 Ohio Rep. 284; Gatewood v. The State, 4 Ibid. 387; Hess v. The State, 5 Ibid. 12; Davis v. The State, 7 Ibid. 204, 5, 6; Anderson v. The State, 7 Ibid. 243.
An indictment is the written accusation originating from the ordeal of the grand inquest of the county, before any person can be put upon his trial for a high crime. As a protection to innocence, and a safeguard against the oppressive and arbitrary exercise of power, it is provided in the bill of rights, among the fundamental principles of our government, that “no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment or indictment of a grand jury;” and also, further, that, “ in any trial, in any court, the party accused ¿bah be. allowed to demand the nature and cause of the accusation against him, and to have a copy thereof.” The indictment, in the contemplation of the constitution, is that written statement of the nature and cause of the accusation, with all the certainty and substantial requirements heretofore sanctioned and declared essential by the settled law of the country. "Why these provisions in the fundamental law of the state? "Why the ceremony and expense of a grand jury to find and return an indictment setting out the “nature and cause of the accusation?” And why guarantee to the accused the right to demand and have a copy of the indictment, if the written averments, descriptive of the crime, are not required to be made with certainty and truth, charging the overt act with all the substantial and distinguishing ingredients which the statute *115 creating the offense has made essential to constitute the crime? If any one or more of the substantial ingredients or distinguishing constituents of the crime may be omitted, the written accusation required would become a mere snare by which to mislead and entrap the accused- on his trial. Where either purpose, intent, or knowledge, is, by the statute, made a distinguishing characteristic of a crime, it is as essential that such purpose, intent, or knowledge should be averred in the description of the act charged as the crime as any other material and distinguishing ingredient. If, when a man’s life is in jeopardy by his being put upon his trial for murder in the first degree, the written accusation against him be sufficient, when the overt act described in it as the crime amounts to nothing more than manslaughter under the specific provisions of the statute creating and defining the offense, the constitu-. tional guaranty of a written charge, setting out the nature and cause of the accusation, is worse than a mere vain thing, and the ceremonial of a grand jury, to charge the accused on presentment and indictment, worse than a mockery and mere farce; it is a deception and a snare, instead of that humane protection against the oppressive exercise of arbitrary power which has been the boast of our country.
It is a well settled rule, in the administration of criminal justice, that to sustain an indictment, it is not incumbent on the part of the state to go further than to prove the substantial and material averments of the indictment. By our statute, a deliberate purpose or intent to kill, is made an essential and distinguishing characteristic in the crime of murder in the first degree, as I have already shown. This, however, not being the case in murder at common law, the form of the indictment for murder in England, and in those states in which the statutes have simply adopted the common law definition of murder, very properly omits a direct charge of a purpose or intent to kill, as a part of the overt act alleged as the crime. *116 Now, the indictment in the case under consideration, which follows strictly the form of the indictment for murder at common law, without conforming to the material change, which our statute has made in the definition of the act declared to be murder in the first degree, is as fob-lows :
“ The State of Ohio, Morgan county.
“ Court of common pleas, of the term of March, in the year of our Lord one thousand eight hundred and fifty-seven.
“ The grand jurors of the State of Ohio, inquiring of crimes and offenses within and for the body of the county of Morgan aforesaid, upon their oath and affirmation, find and present, that Philip Fouts, on the twenty-eighth day of October, in the year of our Lord one thousand eight hundred and fifty-six, with force and arms, at the county of Morgan aforesaid, in and upon the body of one Benjamin P. Scott, then and there being, did unlawfully, feloniously, purposely, and of deliberate and premeditated malice, make an assault, in a menacing manner, and with a certain club, wherewith he the said Philip Fouts was then and there armed, which said club, he the said Philip Fouts, in both his hands, then and there had and held, he the said Philip Fouts, him the said Benj. P. Scott, in and upon the backside of the head of him the said Benjamin P. Scott, then and there unlawfully, feloniously, purposely, and of deliberate and premeditated malice, did beat, bruise, and strike, thereby then and there giving to him the said Benjamin P. Scott, in mid upon the backside of the head of him the said Benjamin P. Scott, one mortal wound, of the length of three inches, and of the depth of one inch, of which said mortal wound he the said Benjamin P. Scott then and there instantly died.
“ And the said grand jurors aforesaid, upon their oath and affirmation aforesaid, further find and present, that one Jonas Fouts, late of Morgan county aforesaid, on the day and year aforesaid, with force and arms, at the county of Morgan aforesaid, unlawfully, feloniously, and of deliberate and premeditated malice, was then and there present, then and there unlawfully, feloniously, purposely, and of deliberate and premeditated malice, aiding, assisting, and abetting the said Philip Fouts, the crime and murder aforesaid, to do, commit and perpetrate.
“And so the grand jurors aforesaid, upon their oath and affirmation aforesaid; do say, that the said Philip Fouts and Jonas Fouts, in manner and. form aforesaid, at the day and year aforesaid, at the county of Morgan aforesaid, unlawfully, feloniously, purposely, and of deliberate and premeditated malice, him the said Benjamin F. Scott, did MU and murder, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Ohio.
“ FRANCIS B. POND, Prosecuting Attorney.
As the charge here made against Jonas Fonts, the plaintiff' in error, is that of being present, and aiding and abetting in the act alleged as perpetrated by the hand of Philip Fonts, it becomes necessary, in order to ascertain the real *117 charge against Jonas, to recur to the averments in the indictment descriptive of the act committed by Philip. The actual assault and battery alleged as causing the death of Benjamin P. Scott, is charged as perpetrated by Philip Eouts, and Jonas’s crime, as charged, consisted in his being present, aiding and abetting in the act of Philip. Now, it will be observed, that although both the assault and the battery are charged as being committed “ unlawfully, feloniously, purposely, and of deliberate and premeditated malice,” the giving of the mortal wound or killing is not so charged. In the description of the overt act charged as the crime, the assault and also the battery are each alleged to have been committed purposely and of deliberate and premeditated malice, but it is not averred that the killing was purposely and of deliberate and premeditated malice. Both the assault and the battery might have been intentional and malicious, and yet the death of the deceased not designed. Had the charge been, that contriving or intending, of deliberate and premeditated malice, to kill the deceased, Philip Eouts had committed the assault and battery as charged, thereby inflicting the mortal wound; or had it been, after stating the assault and battery as charged, added, that Philip Eouts thereby purposely and of deliberate and premeditated malice, inflicted the mortal wound or killed the deceased, and that Jonas, with like intention, was then and there present, aiding, etc., the overt act, in which Jonas is charged as having been present, aiding and abetting, would have come substantially within the statutory description of murder in the first degree. But in neither of these forms, nor any other, is the purpose of deliberate and premeditated malice to kill, contained in the description of the act charged as the crime.
It is urged, however, that this omission in the averments descriptive of the act charged, may be helped or cured by the formal conclusion of the indictment, as follows: “ And so the grand jurors aforesaid, upon their oath and affirmation aforesaid, do say, that the said Philip Eouts *118 and Jonas Pouts, in manner and form aforesaid,” etc., “ did,” etc., “ purposely, and of deliberate and premeditated malice,” etc., “ kill and murder, contrary to tbe form of the statute,” etc. This is not any part of tbe statement of tbe overt act charged as tbe crime, nor even a recital, by way of preamble, after a whereas, but tbe statement of a legal result or conclusion of law. Russell on Crimes, speaking of this conclusion of tbe indictment, 1 vol. 563, says: “ Tbe indictment is concluded by charging tbe murder upon tbe party by way of consequence from tbe antecedent matter, in a positive allegation that tbe prisoner, in manner, and by tbe means aforesaid, feloniously, willfully, and of bis malice aforethought, did kill and murder,” etc. And'tbe court of king’s bench, in Rex v. Nicholas et al., 32 Eng. Com. L. Rep. 620, held, that tbe closing part of tbe indictment, “ and so the jurors do say,” etc., “ is a mere conclusion, and therefore does not require either time or place to be stated in it.” Tbe facts and circumstances constituting tbe offense, must be specifically set forth, with time and place, in a statement of the act of the party direct and positive, and not by way of inference or conclusion of law, or by way of recital after a whereas. 1 Waterman’s Arcbb. Cr. PL 86; 2 Hawk. C. 25, see. 60. A statement of any part of the facts or circumstances constituting tbe offense by way of legal result is bad. Stra. Rep. 1226. “ And tbe want of a direct allegation of any thing material in tbe description of tbe substance, nature or manner of tbe offense, cannot be supplied by any intendment or implication whatsoever, and, therefore, in an indictment for murder, tbe omission of tbe words, “ of malice aforethought,” is not supplied by tbe words “feloniously murdered,” although tbe latter words imply them. 1 Arcbb. 87. Cbitty, in bis work on Criminal Law, 1 vol. 231, speaking of the description of tbe offense in tbe indictment, says: “It is not necessary to state a conclusion of law resulting from tbe facts of a case; it suffices to state tbe facts, and leave tbe court *119 to draw the inference; ” and adds: “ The usual conclusion of an indictment for murder, ‘ and so they, the said defendants, murdered,’ etc., as hereafter observed, is not an exception to this rule.” "We learn from the same author, however, that, although this conclusion, stating a .legal result, is not good or necessary in the statement of the offense charged, yet it has been deemed requisite, in England, to express, by way of legal conclusion, the peculiar technical phrase distinguishing murder from manslaughter. “ The indictment must also, after stating the circumstances constituting the offense, draw the conclusion that, so the prisoner, the defendant, feloniously, etc., did kill and murder, the last word being an artificial term, which it is requisite to use; ” and if it be omitted, the defendant can be found guilty of manslaughter only. 3 Chitty’s Cr. L. 737; Dyer’s Rep. 261. The purpose of this conclusion in the indictment for murder at common law, was not to supply any omission in the statement of the facts and circumces constituting the offense, but to distinguish, by an artificial term, the higher degree of the crime from the lower degree included within it, for which a conviction might be had on the same indictment, if such technical phrase were omitted. According to Chitty, there were certain technical phrases, or terms of art, sometimes inserted in an indictment, which mark out the degree of the offense with precision, and which were deemed necessary to determine the judgment to be rendered. The language of Hawkins on this subject is: “ No periphrasis or circumlocution whatever will supply those words of art, which the law has appropriated for the description of the offense, as murdravit, in an indictment for murder; cepit, in an indictment for larceny; mayhemiavit, in an indictment for maim; felonice, in an indictment for any felony whatsoever,” etc. 2 Hawk. PL Cr. 224. The reason of the introduction of this phrase in an indictment for murder, is said to have its foundation in legislation peculiar to England, and the necessity which was felt by the judges in adopting, in favorem *120 vita, the technical descriptive words employed by the legislature in ousting the offense of the benefit of clergy. Foster 304. Originally, all criminal homicides were entitled to clergy, notwithstanding the difference in atrocity. Ry statutes enacted by parliament, the benefit of clergy was first withdrawn from the most heinous degrees of guilt. The technical phrases peculiar to the description of the crime of murder expressed in the conclusion of the indictment, arose out of the fact that they had been so used in the statutes, which took away clergy from that offense, and thus became appropriately adopted as necessary words of art distinguishing murder from manslaughter, the next lower grade of homicide, and which was clergyable. So that, when these technical terms were omitted, the defendant could be convicted of manslaughter, but not of murder. The word murder, says Foster, 304, became necessary because the statute, Phil, Mary, used the terms willful murder in ousting the offense of clergy, and hence because so descriptive of the crime that it could not be omitted. It was, therefore, peculiar to England, and can have no good foundation in reason, in this state. In the case of Anderson v. The State, decided in Arkansas, where the statute follows the common law definition of murder, the supreme court of that state, in a learned opinion, in noticing the subject of this conclusion in an indictment, used the following language:
“ The entire averment was in fact only a repetition and conclusion of law from the facts previously stated. An indictment omitting that averment certainly describes the offense with such certainty that the accused knows what he is called on to answer, the court and jury the issue they are to try, and that a conviction or an acquittal may be pleaded to a subsequent prosecution. However necessary, therefore, that word was to an indictment in England, it cannot be regarded here in any other light than as a matter ‘ of form not tending to the prejudice of the defendant, ’ which is cured by virtue of our statutes,” etc.
The question whether the formality of this legal conclusion from the antecedent facts and circumstances descriptive of the offense stated in the indictment, be at all essential or requisite in order to express, by way of legal *121 result, the technical term “ murder,” used in the statute of this state, does not necessarily arise in the case before us. And however this may be in Ohio, certain it is, this statement of a legal conclusion cannot, by the settled rules of pleading in criminal cases, supply the omission of any material and essential ingredient of the offense in the direct averments descriptive of the overt act of the party stated as the crime. As already shown, the averments descriptive of the crime must consist of the positive and direct finding of the grand jury upon the evidence before them, and not statements by way of inference or conclusion. It would seem preposterous to say that the grand jury, after finding a part of constituent elements of the crime, might infer the existence of the balance by way of conclusion from what they had found upon the evidence. Suppose that an indictment for an assault with intent to commit a murder, set out in due form, and by direct averments, the assault, and then, by way of inference from the direct finding upon the evidence, concluded, “ and so the jurors, upon their oaths aforesaid, do say that the said A. B. him the said C. D., in manner and form, and by the means aforesaid, intended to kill and murder,” etc.; or, suppose that an indictment for robbery, after setting out the circumstances of the forcible taking by violence from the person of another certain personal property of value, concluded, by way of inference from these facts so found, that the taking was thereby “with intent to rob or steal;” or, suppose an indictment for burglary contain no finding of the intent to steal, except by the way of inference from the antecedent facts found of the willful, malicious and forcible breaking and entering the house in the night season; or, suppose that an indictment for an attempt to commit arson, contains no direct finding of the intent to bum or destroy the building, but simply concludes, by way of inference from the circumstances of the setting fire to the buildings, that there was such intent; or, suppose that an indictment for passing counterfeit money, *122 contains no direct finding of the scienter, but concludes, by way of inference from the passing, that the accused knew the money at the time to be counterfeit, in either of these instances, could it be pretended that the indictment would be sufficient? As the proof to sustain an indictment never need go beyond the averments descriptive of. the offense, if such an indictment be sufficient in either of the supposed cases, all proof to show the criminal intent would be dispensed with. "When it shall be determined that the grand jury need not find all the material elements of the crime charged, but upon finding a part of them may infer the balance, or conclude, as a legal result, that because a part of the ingredients of the crime are found the existence of the balance must follow — when this shall have been determined, then let all principle in criminal pleadings, or the mode of procedure in criminal cases, be utterly discarded. This, however, cannot be done until some of the leading landmarks of the constitution are done away with. If by mere intendment, or the simple statement of a legal result in the formal conclusion of an indictment, material omissions in the description of the offense may be supplied, that humane safeguard for the protection of the citizen against the arbitrary exercise of judicial discretion, supposed to have been secured by the constitutional requirement of the ordeal of a grand jury and of a formal presentment and finding, setting out the nature and cause of accusation, may be at once frittered away by judicial construction. And when we shall come to this, there will be no good sense in requiring any thing more than a written statement of the prosecutor himself, that the accused has committed murder in the first degree, or has committed perjury contrary to the statute of this state, etc., without any averment descriptive of the overt act charged upon the accused for which he is to be put upon his trial for a forfeiture of his life or his liberty.
It is, therefore, the opinion of a majority of the court, on full consideration, that the indictment, in this case, is *123 insufficient for want of a positive and direct averment of a purpose or intention to MU, in tlie description of the offense.
"We are strengthened in the view here expressed by the decision of the supreme court of Pennsylvania, in the ease of Johnson v. The Com., 24 Penn. St. Rep. 387, in which it was held that a premeditated intention to destroy life is indispensable in order to constitute murder in the first degree by statute in that state, and that that was not charged in the form of an indictment at common law.
It has been urged that this court had decided this question otherwise, in the case of Moore v. The State of Ohio, 2 Ohio St. Rep. 501, by approving an indictment of the same kind. In answer to this, it is sufficient to say, that this question was not raised or brought to the attention of the court in that case. A reported decision, although in a case in which the question might have been raised, is entitled to no consideration whatever as settling, by judicial determination, a principle not only not passed upon, but not raised or even thought of, at the time of the adjudication.
Again, it is urged that the question of the sufficiency of this indictment is settled by long-continued, uniform and uninterrupted practice in this state, in adopting and using the form of the indictment for murder at common law in prosecutions under our statute. That there has been any such long-continued and universal pz'actiee in this state, is an assumption, and wholly unsustained by the facts. That many prosecuting attorneys may have followed the English form of the indictment for murder, withoizt considering the difference as to what constitutes murder at common law, and what under our statute, may be conceded. But this professional inadvez’tence has not been uniform and universal in this state, as even the files of this court will show. In the case of Robbins v. The State, from Marion county, now pending here on a writ of ezTor to reverse a judgment and sentence for murder in the first degree by poisoning, the indictment is not deficient in this respect, but contains a direct and positive *124 averment of the purpose or intent to kill. And also in casq, of Leoffner v. The State of Ohio, from Hamilton county, now pending in this court on writ of error to reverse a judgment and sentence on a conviction for murder in the first degree by stabbing, we find that the indictment is not defective in this respect, but contains a sufficient substantial averment of an intentional killing. In the case of The State of Ohio v. Ward, in which the defendant was convicted and executed in Lucas county, in 1857, the last count of the indictment charged an intentional killing, (Man. Cr. Law 218.) And in the eases of The State of Ohio v. Arrison, tried in Hamilton county, in 1855; and The State v. Artis, tried in Shelby county, (Warr. Cr. Law 28, and 85,) which were cases of murder in the first degree, the indictments were not subject to this objection. If an erroneous practice has, however, to some extent prevailed through inadvertence, at variance with settled principles in the administration of criminal justice, it cannot be too speedily corrected.
The judgment of common pleas is, therefore, reversed, and the cause remanded for further proceedings.
Scott and Sutliff, JL, concurred.